Filed 8/3/22  In re Thompkins CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re RAYMOND THOMPKINS,<br><br>on Habeas Corpus. | A160500<br><br>(Solano County<br>Super. Ct. No. VCR223508) |

In 2017 Raymond Thompkins was tried for three crimes he was charged with committing in 2015 against three of his wife's young granddaughters, A.G., T.C., and J.G.  It was the third trial involving J.G., the first trial involving the other two.  Thompkins was convicted of the crimes against A.G. and T.C., but acquitted of that involving J.G.

Thompkins appealed, and a lawyer from the panel of the First District Appellate Project (FDAP) was assigned to represent him.  Counsel filed an opening brief that made two arguments, one of which was vindictive prosecution, based on how the charges involving A.G. and T.C. became involved.  Following some criticism by us of the reply brief, counsel met with FDAP and then filed a supplemental brief.  We issued our opinion, rejecting both arguments.

Following our opinion, FDAP itself substituted in as attorney for Thompkins and, represented by J. Bradley O'Connell, Associate Director,

1

filed a petition for rehearing, which, as pertinent here, again asserted a claim of vindictive prosecution. We again rejected the claim. FDAP filed a petition for review, raising three claims: (1) vindictive prosecution; (2) hearsay/confrontation error; and (3) ineffective assistance of trial counsel. The Supreme Court denied review, in an order that provided it was "without prejudice to the right to seek relief by way of petition for writ of habeas corpus as to ineffective assistance of counsel and ineffective assistance of appellate counsel." FDAP then filed the within petition for writ of habeas corpus against the Director of the Department of Corrections and Rehabilitation (Director), asserting those two claims. The Director filed informal opposition, Thompkins a reply, and we issued an order to show cause. The Director then filed a traverse, Thompkins a return, and we held oral argument. We now deny the petition.

## BACKGROUND

### The General Setting

In 2013, while he was in prison, Petitioner Raymond Thompkins (Thompkins or petitioner), met B.T., and they married soon thereafter. B.T. had a daughter (mother) who had five children, three of whom would become involved in the charges here: sisters A.G., T.C., and J.G. In February or March of 2015, mother asked B.T. to temporarily take custody of her five children while she searched for housing, and for a short while the three sisters, another sister, and their brother lived with B.T. and Thompkins—until April 18.

On April 18, Tara Gulley and her husband were approaching their truck after a walk on the Vallejo waterfront when she noticed Thompkins sitting in a nearby car with his head laid back, his eyes closed, and a three- to four-year-old girl, later identified as J.G., sitting on his lap. Thompkins was

"panting," "had sweat on him," and an expression of "pleasure" on his face; "it just didn't look right." Gulley moved her truck to block Thompkins's car from leaving, and then walked up to the car and saw that the little girl was holding Thompkins's penis and moving her hand up and down. Gulley dialed 911, described what she had seen, and said that she had blocked the car. While she was on the phone, Thompkins and the little girl left the car and walked away, but they soon came back with three other children. Gulley moved her truck as instructed by the 911 operator, after which Thompkins and all four children entered his car and he drove away.

**The First Case and the Two Trials**

On April 21, 2015, the Solano County District Attorney filed a complaint, case No. VCR223508, charging Thompkins with committing a single count of lewd acts (Pen. Code[1] § 288, subd. (a)) upon J.G., a child under 14 years of age, and alleging Thompkins had suffered three prior serious felony convictions. (§ 667, subd. (a)(1).) A preliminary hearing was held on June 16, where Gulley testified, and Thompkins was held to answer.

The developments following that complaint are at the heart of Thompkins's claim of vindictive prosecution and we set forth those developments in detail, with most of the facts taken from our opinion filed June 14, 2019.[2] (*People v. Thompkins* (Jun. 14, 2019, A152363) [nonpub. opn.] (*Thompkins*).)

On June 19, an information was filed in the case, alleging the same single count charged in the complaint. And as in the complaint, the prior serious felonies were alleged only in connection with section 667, subdivision

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Which opinion is one of the many items Thompkins requests we take judicial notice of, which we do.

3

(a)(1), which imposes a five-year enhancement for the commission of a second serious felony. It was not alleged that the prior felonies subjected Thompkins to punishment under the three strikes law.

On the eve of trial, which had been set for August 5, Thompkins sought a continuance to allow counsel time to review discovery belatedly provided by the People. Trial was reset for April 6, 2016, which date was confirmed at a readiness conference on March 7, at which conference plea bargaining took place in the trial judge's chambers. On March 21, due to a conflict with another scheduled trial, the prosecutor moved for another continuance, and trial was reset for May 25. Then, on May 23, the prosecutor requested still another continuance, and trial was reset for June 2.

On May 31, Thompkins moved for further discovery. The parties also filed motions in limine, which were heard that day.

On June 2, the day last set for commencement of trial, 12 jurors and two alternates were selected and sworn.

On June 3, prior to the commencement of testimony, the prosecutor moved "to amend the information to allege defendant's strike prior," specifying a "strike prior from 1991 for kidnapping and robbery." The motion stated that "[i]t is unclear why the strike prior was excluded from the information. It appears to be an oversight since an enhancement based on that same prior was alleged in the information." The court adjourned the proceedings and directed jurors to return on June 9.

On June 8, Thompkins filed a non-statutory motion to dismiss the information "for due process violation and for prosecutorial misconduct" in delaying commencement of trial and refusing to disclose evidence that could be used to impeach Gulley. The next day, June 9, Thompkins moved to dismiss the information on the additional ground that the destruction or

4

unavailability of a document containing Gulley's statement violated his due process right to a fair trial, as set forth in *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51.

The court refused to rule immediately on the two motions to dismiss, ordered the trial continued, and inquired of the jurors previously selected and sworn whether they could return at a future date. Too many jurors were unavailable, and the court declared a mistrial.

On July 6, the court granted the People's unopposed motion to amend the information to specify that a prior felony conviction subjected Thompkins to the "Three Strikes" law.

On July 20, a second jury was sworn in case No. VCR223508. On July 22 the jury announced it was unable to reach a verdict and the court declared a second mistrial. According to a statement of defense counsel—a statement the prosecutor did not dispute—the jury voted 10 to two for acquittal.

**The Second Case**

On August 9, the People filed a complaint in a second case, No. VCR227210, charging Thompkins with two counts on two newly alleged victims, A.G. and T.C. The district attorney advised the court that, although the new complaint did not allege the prior strikes in the first case, he intended to consolidate the two cases "and the prior strike and a five-year enhancement, as has already been alleged in [case No.] 223508," would continue to operate. Defense counsel remarked that the district attorney "can do that at any time. He doesn't need our approval to do that," after which the court stated: "That's fine. If both parties agree . . . that's possible." The court then inquired whether the parties were "deeming the complaint an Information?" The district attorney and public defender agreed they were,

5

and Thompkins waived his right to a preliminary hearing, stating, "I will deem the complaint an information per your request."

On November 10, the court granted the People's motion to consolidate the first case (VCR223508) and the second case (VCR227210).

On November 21, the People moved to further amend the amended consolidated information "to allege [a] strike prior." The motion stated that the initial case, No. VCR223508, "went to trial but the jury hung and the court declared a mistrial. The information in that case alleged three prior strikes and a charged strike. During plea negotiations before trial, the People had warned that if they were unsuccessful in securing a guilty verdict, they would bring additional charges and seek a life sentence. After the jury hung, the People filed VCR227210 and moved to join the cases. On November 16, the court granted the People's motion to join cases VCR223508 and VCR227210. Now the People are moving to amend the language to make it clear that they are seeking a life sentence under the three strikes law." (*Thompkins*, *supra*, A152363, at pp. 11–12.)

When the court inquired whether the proposed amendment "add[s] new people, new victims?", the district attorney stated it did not, saying "[i]t simply adds an extra paragraph making it clear we are pursuing [a] three strikes penalty in this case. The priors have already been alleged since the very beginning, and we had invoked the two-strikes law." The court asked defense counsel whether Thompkins objected to the motion to amend, and she said "no," but then said "I should take that back, your Honor. Given that they are alleging—that this is a three strikes case, the underlying offenses, I believe they are from one course of conduct. So, of course, I would object on that ground. . . ."

6

The court granted the request to amend. As material here, the amendment stated that Thompkins "has been convicted of the following two or more serious and/or violent felonies, as defined in . . . section 667[, subdivision] (d) and . . . section 1170.12[, subdivision] (b)," and identified his three prior strikes. The amendment added that, "Furthermore, Counts ONE, TWO, AND THREE is [*sic*] a serious and/or violent felony thus subjecting the defendant to sentencing pursuant to the provisions of Penal Code section 667[, subdivisions] (b)–(j) and Penal Code section 1170.12." (*Thompkins*, *supra*, A152363, at pp. 11–12.)

On December 2, the district attorney moved to further amend the amended consolidated information to correct specified "miscellaneous language" and to add an allegation that the three charged offenses were committed against multiple victims. Defendant opposed the motion, relying on the doctrine of vindictive prosecution. The court rejected the argument and granted the People's motion to amend.

**The Third Trial**

Trial on the consolidated cases began in April 2017. The jury was selected on April 13, following which counsel gave opening statements. The first day of testimony was April 14, testimony that would be taken over three more days, April 18, 19, and 21. Over 20 witnesses testified, including the victims A.G. and T.C.; J.G. was deemed incompetent to testify. The testimony on the last day, April 21, included that from two expert witnesses, Anthony Urquiza on behalf of the People, followed shortly by William O'Donahue on behalf of Thompkins. Dr. Urquiza's testimony is the basis of petitioner's claim of ineffective assistance of trial counsel here, and will be discussed in detail in connection with that claim.

In *Thompkins* we described for over six pages the facts put before the jury by those many witnesses. And we quote extensively from that opinion, (referring to Thompkins as appellant), where we described those facts:

"Officer Jade McLeod, who responded to Gulley's 911 call, located and performed a traffic stop of appellant. One child was in the front passenger seat and three children were in the back. McLeod arrested appellant and later took a statement from Gulley. After reviewing the videotape of his interview with Gulley, Officer McLeod realized that his report of the interview was erroneous in two respects. Gulley did not tell him that the car seat appellant was sitting on was laid back, nor did she say appellant's penis was erect. As instructed, McLeod took appellant to Kaiser Hospital in Vallejo for a sexual assault response team (SART) exam that was conducted there by Nurse Kari Cordero.

"Nurse Cordero conducted a sexual assault examination of appellant using a 'Woods lamp,' which 'flouresces' (i.e., lights up) any DNA, although it can fluoresce other substances, such as semen or saliva. The Woods lamp lit up appellant's scrotum area. Cordero also used a Q-tip to swab appellant's mouth, penis, and scrotum. Cordero deposited all of the evidence she collected in a sexual assault kit, which was later transported to the Richmond laboratory of the Department of Justice.

"Heather Tomchick, a criminalist employed in the Richmond lab, conducted an analysis of the swabs taken from appellant and found semen present in both the penile and scrotal swabs.

"At some point after appellant was arrested, J.G. was placed in the foster home of Kenneth Boyd and his wife, who had been foster parents for 17 years. Kenneth Boyd testified that J.G. had been in his home for 'maybe a year or longer,' and 'frequently' exhibited 'unusual behavior,' such as

'inserting toys into her vagina and touching her private parts with her own hands.' He also would see her 'humping on the bed,' and 'taking her clothes off in front of other children,' and she had frequent tantrums. Caring for J.G. 'got to be too much,' he stated, because she required a higher level of care than he was paid for, so he gave up the placement.

"Clinical Social Worker Stephanie Ladd testified that some of the behavior Kenneth Boyd described was not 'developmentally normal.' Asked whether it was 'developmentally appropriate or common' for a five-year-old girl 'to insert things into her vagina,' Ladd stated that it is 'usually a red flag' because 'children learn based on what they have seen or experienced.'

"A.G., who was seven years old at the time of trial, testified that T.C. and J.G. were her sisters. When asked whether she had ever seen appellant, who she and her sisters called 'Poppa Ray' or 'Papa Ray,' touch anyone in a way that was a 'bad touch?' she answered 'No.' Asked did she 'ever sit in Poppa Ray's lap?' she said 'I don't know.' Asked whether she remembered talking to a lady one day in a conversation that was videotaped she said 'No.' Asked 'has Poppa Ray ever taken off your clothes?' she made no response. When the district attorney inquired whether 'there is anything that would help you be able to talk?' A.G. said 'I don't know.' At that point the court declared a brief recess.

"When the proceedings resumed, defense counsel asked A.G. a series of questions regarding her past experiences with Starla and Leanne, who had apparently interviewed her during dependency proceedings or appellant's prior criminal trial, and statements she made to them, such as whether she remembered telling these two women 'that Poppa Ray did not touch you' and that she told her mother that a Wendy had 'told you to lie.' A.G. did not remember those questions or much of anything else she was asked about.

9

However, when asked by the district attorney on redirect whether she had been 'telling the truth here today?' A.G. said 'Yes' and said 'No' when asked whether she was 'telling any lies here today.' At that point, the court initiated a conversation with A.G. establishing that she was 'uncomfortable' and did not want to talk 'about good touches and bad touches.' The court then asked counsel 'can we allow [A.G.] to leave?' and both answered 'yes.'

"Over objection, the district attorney was permitted to play a videotaped interview with A.G. that took place about two years earlier, when she was five years old. A.G. stated in the interview that when she was in the bathroom brushing her teeth her grandfather touched her private part and her behind over her clothes. At another time he touched her 'private part' while she was in her bedroom. At that time he pulled down her pants but not her underwear. Appellant's skin did not touch A.G.'s skin. When A.G. told appellant she did not want him to touch her 'body parts' he said 'no.' He also told her 'don't tell anyone' and A.G. did not. A.G. considered what appellant did to be 'bad.' A.G. said she saw appellant touch T.C.'s body part over her clothes when T.C. was in the bathroom. When asked whether what 'Papa Ray' did was good or bad, A.G. answered 'bad.' Asked whether appellant ever asked her to touch his body parts, A.G. answered 'no.'

"Nine-year-old T.C.'s testimony under oath was perhaps even more evasive than that of A.G., so that she too was excused, and the court allowed into evidence her previously videotaped interview.

"In that interview, which took place shortly after appellant was arrested two years earlier when she was seven years old, T.C. stated that on a Sunday when her grandmother was still in bed, she was sitting in a rocking chair in the living room when appellant told her to get up. When she moved to the couch, appellant followed and did not stop when she told him to. He

tried to touch her in her 'private, in the back, B-U-T-T' with his hand under her clothes. He also pinched her nipples once (which the interviewer referred to as 'nip-nips'). A.G. also said appellant touched her inside a 'private' she described as the 'middle' and a 'different place' than her butt. Appellant did not stop when she told him to, but 'kept doing it.' When he finally stopped, T.C. got up and told her grandma and '[s]he told him to stop' and '[t]hen he did.' T.C. was six when this happened. T.C. also stated that she had seen [defendant] touch J.G.'s butt with his hand under her clothes, and A.G.'s 'private part.' J.G. had told T.C. that appellant 'put his hand in her private, her front and . . . her back.'

"T.C. also said she saw appellant put his hand in J.G.'s tights, and his hand was '[g]oing all over the place.' J.G. said nothing at the time but later told T.C. that Papa Ray 'kept digging in back and in the front.' On the occasion that T.C. saw appellant put his hand in A.G.'s privates, appellant told her not to tell her grandmother, because 'he didn't want her to know.' Appellant said he would 'ground me and whoop me' if she told her grandmother, but she told her anyway because 'I didn't wanna keep a secret.'

"B.T., appellant's wife and the grandmother of J.G., A.G., and T.C., testified that at the time the three girls were living in their home, appellant was working at the Gap in San Francisco and would be gone from 4:00 in the morning until after 6:00 or 7:00 at night. Every Saturday she took the family to church and would never leave her grandchildren at home. Mother visited them 'practically seven days' a week.

"After the family returned home from church on April 18, 2015, the children asked appellant to take them to the waterfront to feed the birds. Appellant took them there and during that time talked to B.T. on the phone for 30 minutes.

11

"B.T. denied T.C. ever told her that appellant had touched her or any of the other girls. She also stated that her granddaughters did not use the phrase 'private parts' but instead called such bodily parts 'punani.' B.T. again denied that appellant was ever home alone with her grandchildren.

"Mother of the three alleged victims testified that during the time the children stayed at B.T.'s home she visited them there every day in the morning before school and in the afternoon after school, and appellant was never present. B.T. (grandmother of the three alleged victims) always took the children with her when she went to church on Saturday or anywhere else unless Mother was with them; she would not leave the children in [defendant's] care because 'he wasn't trustworthy.'

"T.C. and A.G. never used the term 'private parts' Mother stated, but called those parts of their body 'kit-kit.' Neither T.C., J.G., nor A.G. ever told her they had been touched by appellant. When Mother asked one of them—it was either A.G. or T.C. but she could not recall which one—why she stated in the taped interview that appellant had touched her, she said that the social worker, Wendy, 'told me to say it.' Mother continued to visit her daughters after they were placed in foster care. J.G. was placed in three different homes. During the time she was at Kenneth Boyd's foster home 'she was hitting me. Which is not her at all. She was really violent towards her sisters and brother.' And there were 'reports that she was taking off her underwear and throwing them on the ground in the back yard and touching other little kids inappropriately and, yeah, that sort of stuff.'

"Mother stated that she was going to court to get reunification services but denied there was any danger of losing her parental rights. She admitted she 'hated' certain social workers because '[t]hey took my kids.' Asked whether she remembered having a discussion with Social Worker Wendy

12

Smith in which 'she asked you what it would mean to you if the girls had disclosed abuse to Wendy Smith, and you said it would mean that you failed and you weren't as close to the girls as you thought?' Mother denied that that was what she said. What she had said was, 'I'm confident in my relationship with . . . all four of my daughters. And I was willing to bet money that if anything had ever happened, they would tell me. I would be the first person to know.'

"Latoya, a cousin of J.G., A.G., and T.C., testified that when T.C. was in foster care, she asked Latoya, 'when do I get to go home?' After Latoya said she did not know, T.C. 'said she was lying about something, but she never— she wasn't specific about what she was lying about.'

"The girls' brother, who was 11 years old at the time of trial, remembered going to the Vallejo waterfront with appellant two years earlier on April 18, 2015 to feed the birds. He thought three of his four sisters went with them but was unable to remember which ones. He did remember that when he returned to their car he saw that J.G. was asleep and appellant was playing a game on his phone.

"Wendy Smith was a social worker assigned to Solano County Child Welfare Services to investigate a dependency proceeding involving J.G., A.G., and T.C. She met with them 10 to 20 times prior to the time of their videotaped interviews, which she did not attend. However, she did not discuss the events that allegedly took place at the waterfront on April 18, 2015, until June 30, about 72 days later. At that time, the children were aware of the allegations against [defendant] but had made no statements regarding them. When Smith began discussing the allegations (i.e., the allegations of Gulley about what happened on April 18, 2015), 'the girls began to disclose beyond what was initially disclosed.' When asked if the alleged

13

conduct of [defendant] only happened one time on April 18, and only to J.G., the children indicated it happened more than one time and to others beside J.G.

"Kwanda Sylvester, a Solano County social worker assigned [to] the three girls in October 2015, never saw J.G. act out 'sexually.' Though she had been placed in at least three different foster homes, Kenneth Boyd was the only foster parent who ever expressed concerns about J.G. acting out sexually during the four- or five-months Sylvester was assigned to the girls.

"Dr. William O'Donahue, a professor of clinical psychology at the University of Nevada who specializes in child sex abuse, spent 10 hours reviewing 25 documents regarding appellant and the allegations against him in this case." (*Thompkins*, *supra*, A152363, at pp. 2–8.)

On April 26, the court gave preliminary instructions, counsel gave closing arguments, the court gave its concluding instructions, and at 11:45 a.m. the case was in the hands of the jury. That afternoon the jury requested an exhibit and readback of the testimony of Officer McLeod and Gulley. The readback occurred and deliberations resumed.

Deliberations continued on April 27, in the afternoon of which the jury announced it had reached a verdict. The jury acquitted Thompkins on the count involving J.G., but convicted him on the counts involving A.G. and T.C. The jury also found true both the original "serious felony" allegation and the "third strike" allegation. The court thereafter imposed an aggregate sentence of 60 years to life, consisting of consecutive "third strike" terms of 25 years to life for each lewd act, and two five-year enhancements (§ 667, subd. (a)(1)) on each term.

On August 23, Thompkins appealed.

14

**The Appeal and Our Opinion**

First District Appellate Project (FDAP) panel attorney Orzo Childs was appointed as counsel for Thompkins on appeal. On July 3, 2018, Mr. Childs filed his opening brief, which made two arguments: (1) the conviction and prior strike enhancement must be reversed because charging them constituted prosecutorial vindictiveness, and (2) erroneous admission of videotaped testimony of victims violated the confrontation clause. There was no claim of lack of substantial evidence to support the convictions, nor attacking the quality of the evidence. Other than the evidentiary claim as to the videos, there was no claim of any error by the trial court, not in the giving of instructions or in responding to the jury's request. There was no claim of prosecutorial misconduct. Finally, and perhaps significant on the first issue here, Mr. Childs—or for that matter, FDAP—made no claim of ineffective assistance of trial counsel.

Mr. Childs's briefing of the vindictive prosecution claim is at the heart of petitioner's second claim here, which initial briefing cited four cases: *North Carolina v. Pearce* (1969) 395 U.S. 711; *Blackedge v. Perry* (1974) 417 U.S. 21; *Twiggs v. Superior Court* (1983) 34 Cal.3d 360 (*Twiggs*); and *In re Bower* (1985) 38 Cal.3d 865 (*Bower*). The argument relied on "due process under the 14th Amendment of the United States Constitution," and had no reference to any protections of the California Constitution (art. I, §§ 7, 15), arguing that "penaliz[ing] a defendant by filing new charges in response to his assertion of a right to trial denies due process under the 14th Amendment" and that "vindictiveness is presumed when the prosecution ups the ante after a mistrial."

The Attorney General's respondent's brief devoted 14 pages to the vindictive prosecution claim and discussed numerous cases not cited in

15

Thompkins's opening brief, including federal circuit court opinions. The Attorney General's principal argument was that the increased charges were "part of the give-and-take of the plea bargaining process," and that because the possibility of those charges had been mentioned during negotiations before the first trial, there was no presumption of vindictive prosecution.

On December 13, Mr. Childs filed his reply brief. And in an order filed February 14, 2019, we said this about that reply brief: "Insofar as it addresses the issue of prosecutorial vindictiveness, appellant's reply brief consists of no more than a page and a half reiteration of the argument made in the opening brief. The brief does not mention, let alone analyze and respond to, any of the numerous state and federal cases cited and discussed by respondent. . . ." Our order directed counsel to "file a supplemental reply brief addressing the case law relied upon by the Attorney General" and to "also address the applicable standard of review."

On April 2, 2019, Mr. Childs filed a supplemental reply brief. As to what happened leading to that brief and what followed it, we quote from Thompkins's petition (with all record references omitted): "In view of the Court's evident concerns as to the adequacy of the prior briefing, FDAP consulted with appellate counsel Childs on the matters to address in the supplemental reply brief. FDAP provided extensive substantive comments on analysis of the vindictive prosecution issue for his draft brief. [Citation.] Mr. Childs's supplemental reply brief [citation] did incorporate a number of FDAP's recommendations. However, the that [*sic*] brief still failed to address two crucial substantive subjects urged in FDAP's recommendations [citation].

"Like counsel's previous briefs, the supplemental reply brief said nothing about the independent state constitutional basis of the California Supreme Court's leading vindictive prosecution cases, *Twiggs v. Superior*

16

*Court* and *In re Bower* [citation]; and the brief did not explicitly address the role of prior attachment of jeopardy in the leading cases' analysis of the circumstances giving rise to a presumption of vindictiveness [citation]." A footnote added this: "[t]he supplemental reply did include two sentences, specifically suggested by FDAP in its marked comments on Mr. Childs's draft, which mentioned jeopardy. [Citation.] But the brief did not include any explicit discussion of the role of prior attachment of jeopardy in the leading cases' analysis of vindictive prosecution. [Citation.]"

"At the time of its consultation with Mr. Childs on the supplemental reply brief, FDAP had also specifically urged him to submit a separate supplemental brief seeking a resentencing remand under recent litigation giving sentencing courts discretion to strike 5-year 'serious felony' enhancements. (Stats. 2018, ch. 1013 ([Senate Bill No.] 1393).) Such enhancements, which accounted for 10 years of Mr. Thompkins's 60-to-life sentence, had been mandatory at the time of the original sentencing. However, Mr. Childs failed to file any supplemental brief on that sentencing issue during the three months between FDAP's advice and this Court's issuance of its opinion. [Citation.]"

On June 14, we filed our unpublished opinion, rejecting both of Thompkins's claims. Our opinion was 31 pages long, over six pages of which was the recitation of facts, many of which are quoted here. We devoted over 15 pages to discussing—and rejecting—the vindictive prosecution claim, concluding that the increased charges did not raise a presumption of vindictiveness because the prosecution had raised the possibility of adding the charges during pretrial negotiations. As we put it, "The fact that in this case the additional charges were added after a mistrial and before the subsequent retrial does not change the result, given that the prosecution had

17

informed appellant of the possibility of such charges during plea negotiations that took place well before the prior trial ended in a mistrial." (*Thompkins*, *supra*, A152363, at p. 23.)

**Developments Following Our Opinion**

Thompkins's petition describes what happened following our opinion, and we again quote from that petition: "After the Court filed its original opinion, FDAP suggested that Mr. Childs request leave to withdraw, so that new counsel could substitute into the case. FDAP made that recommendation due to concerns over the quality of Mr. Childs's work, including: 1) the strong criticism of his original briefing in the Court's February 2019 order; 2) his failure to follow through on important points suggested in FDAP's recommendations on the supplemental reply brief; and 3) his failure to act on FDAP's recommendation that he file a separate supplemental brief seeking a resentencing remand for reconsideration of the serious felony enhancement pursuant to S.B. 1393. [Citation.]

"Mr. Childs agreed to request withdrawal. [Citation.] On June 24, 2019, on FDAP's recommendation, the Court vacated Mr. Childs's appointment and reassigned the *Thompkins* appeal as a FDAP staff case. [Citation.]" FDAP substituted in, replacing Mr. Childs, and on June 28, FDAP filed a petition for rehearing. As the petition describes it, "FDAP immediately filed a rehearing petition raising two grounds—(1) a request for a remand for the sentencing court to exercise its newly-conferred discretion as to the section 667[, subdivision] (a) enhancements; and [(2)] . . . that the Court reconsider its disposition of the vindictive prosecution claim."

On July 12, we filed an order modifying the opinion that remanded the case for the sentencing court to exercise its discretion under the newly-

18

enacted section 667, subdivision (a)(1), (Stats. 2018, ch. 1013, §§ 1–2.) (S.B. 1393).[3] We otherwise denied rehearing.

On July 29, FDAP filed a second petition for rehearing, raising a claim of ineffective assistance of trial counsel. On August 12, we denied the petition without modification of our opinion.

On August 21, FDAP filed a petition for review, raising three claims: (1) vindictive prosecution; (2) hearsay/confrontation error; and (3) ineffective assistance of counsel. On October 30, the Supreme Court denied review, in an order that provided it was "without prejudice to the right to seek relief by way of petition for writ of habeas corpus as to ineffective assistance of counsel and ineffective assistance of appellate counsel."

**The Petition for Writ of Habeas Corpus**

On July 17, 2020, represented by Mr. O'Connell, Thompkins filed this petition for writ of habeas corpus naming the Director. It was 99 pages long, in addition to which it included an appendix containing 14 exhibits; it also requested we take judicial notice of the entire record in case No. A152363. The Director filed informal opposition, Thompkins a reply, and we issued an order to show cause.[4] The Director filed a return, petitioner a traverse, and we held oral argument. We now deny the petition.

---

[3] On remand, the trial court struck the two five-year enhancements and reduced Thompkins's sentence to 50-years-to-life.

[4] An order that is appropriate when the petition appears to have merit, that is, states a prima facie claim for relief. (*Durdines v. Superior Court* (1999) 76 Cal.App.4th 247, 251; *In re Serrano* (1995) 10 Cal.4th 447, 454–455 [order to show cause does not establish that petitioner is entitled to relief, but is preliminary determination]; see generally *In re Hochberg* (1970) 2 Cal.3d 870, 875, fn. 4.)

19

## DISCUSSION

**The Law**

As noted, Thompkins makes two arguments, both asserting ineffective assistance of counsel, the first, by trial counsel Carrington, the second, by appellate counsel Childs. We thus begin with the law of ineffective assistance of counsel, beginning with reference to *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*), where the Supreme Court set out several governing principles, including these:

" Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland*, *supra*, 466 U.S. at p. 689.)

"[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. . . . [¶] It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] . . . [¶] The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*,

20

*supra*, 466 U.S. at pp. 693–694; see generally *In re Cordero* (1988) 46 Cal.3d 161, 180; *People v. Ledesma* (1987) 43 Cal.3d 171, 216; *People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

"[T]o be entitled to reversal of a judgment on grounds that counsel did not provide constitutionally adequate assistance, the [defendant] must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) "The likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 112.)

"[T]he question is not what the ' "best lawyers would have done," ' not ' "even what most good lawyers would have done," ' but simply whether ' "some reasonable lawyer" ' could have acted, in the circumstances, as defense counsel acted in the case at bar." (*People v. Jones* (2010) 186 Cal.App.4th 216, 235.)

And perhaps most apt to the issue before us here are these three principles:

(1) "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (*Strickland, supra*, 466 U.S. at. p. 690; *People v. Weaver* (2001) 26 Cal.4th 876, 926).

(2) "Defense counsel's performance cannot be considered deficient if there was no error to object to." (*People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1520).

(3)  Counsel is not incompetent for failing to anticipate a change in law. (*People v. Dennis* (1998) 17 Cal.4th 468, 537; *People v. Turner* (1990) 50 Cal.3d 668, 703; see *People v. Criscione* (1981) 125 Cal.App.3d 275, 295 ["[C]ounsel are not to be faulted for failing to anticipate subsequent Supreme Court decisions, prescience being no more required of competent counsel than omniscience"].)

## The Claim of Ineffective Assistance of Trial Counsel Has No Merit

Thompkins's first argument is directed to the conduct of trial counsel, Carrington who, in Thompkins's words, was ineffective for "allowing expert testimony on the rarity of false allegations of molestation and the frequency of recantation from child victims."  The claim is based on how Carrington acted—perhaps more accurately, failed to act—in dealing with some testimony from Dr. Urquiza, the expert witness called by the prosecution. We thus begin with discussion of Dr. Urquiza's testimony.

Dr. Urquiza's testimony was fundamentally devoted to child sexual abuse accommodation syndrome (CSAAS), a theory that identifies behaviors of sexually abused children, testimony our Supreme Court has held " 'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*).)  CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, and the expert providing CSAAS testimony may not give " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).)  Nor is it proper for an expert to present "predictive conclusions" (*ibid.*), such as alleged child abuse victim "should be

22

believed," or "abused children give inconsistent accounts and are credible nonetheless." (*Id*. at p. 394.) In short, "The expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.)

Dr. Urquiza emphasized that CSAAS was an educational, not a diagnostic, tool: "the child sex abuse accommodation syndrome should not be used to make a determination as to whether a child is abused or not because it assumes a child has been abused. Its purpose is educational." He further explained, "In this case the purpose is to educate a jury so that they have good information about sexual abuse sort of as a foundation so that when they hear the evidence in this case, they may not be subject to any misperception or myths that they have previously held and would be able to render a better decision about guilt or innocence."

Dr. Urquiza explained that CSAAS is based on observational data, not experimental scientific studies. This is because "[y]ou cannot impose an experimental design where you assign people to go get abused and then later examine how they responded. . . . There is no research because you can't do that research." As such, the concept of an "error rate" is inapplicable.

Dr. Urquiza did not know about Thompkins's case, and had not read relevant investigative reports. And he went on to explain, "I'm not here to testify about any . . . specific aspect of this case. My position is . . . to testify about the research related to child sex abuse, . . . to educate jurors about sexual abuse. Not to render any opinion about whether somebody is guilty or innocent of a crime or to say whether a particular child has been abused or not. That would be improper."

Dr. Urquiza testified that there are myths or misconceptions about the way that sexually abused children react or behave. One such misconception

23

is that "[i]f a child has been sexually abused, they will tell right away." And, he explained, this misconception "fails to appreciate the context in which abuse occurs," including how sexually abused children are sometimes coerced, told to keep quiet, or threatened. Additionally, shame, embarrassment, confusion, or guilt may affect a child's "ability or willingness or comfort in talking about their own sexual victimization."

Then, and germane to the issue here, Dr. Urquiza testified that another misconception is that "[i]f you make a disclosure of sexual abuse and then you take it back, . . . you were never abused to begin with." Dr. Urquiza testified that recantations do not occur often, "[b]ut they do, in fact, happen. The best estimate we have is somewhere in the range of 20 to 25 percent of kids who have been abused at some point will take back the allegation of abuse." The specific testimony was this:

"Q. All right. What about a child denying the abuse? Or let me rephrase that. What about a child initially disclosing and then recanting, saying that it didn't happen?

"A. Okay.

"Q. Is that—are there myths or misconceptions associated with that?

"A. Well, the idea is if you are sexually abused and you disclose and then you take it back—or I'm sorry. Change this. If you make a disclosure of sexual abuse and then you take it back, the misperception is you were never abused to begin with.

"Q. Why is that a misconception?

"A. I think it's a misperception because people don't often understand the context of abuse and the reasons why a child would recant or take back the allegation. So if you understand what some of the context is with regard to sexual abuse and why a child would—and we have research to support

24

this—why a child would take back the allegation, recant the allegation who actually had been sexually abused, then it's easier to understand.

"So you have to understand the context. You have to understand the underlying dynamics to see what some kids, given the correct situation, would take back, would recant the experience of being abused. Some kids who have been sexually abused take back the allegation of abuse.

"Q. Do recantations happen even though they were truthful, there was abuse actually happening?

"A. Well, yeah, that's the issue. The issue is—a recantation is you have been abused, and at some point after you disclose, you take back the allegation. Now, do they happen often? No. But they do, in fact, happen. The best estimate we have is somewhere in the range of 20 to 25 percent of kids who have been abused at some point will take back the allegation of abuse.

"Q. All right. So the misconception in the public is that if there is a recantation, it means it didn't happen?

"A. Correct."

Dr. Urquiza testified that CSAAS details the "kinds of behaviors that we tend to see together that comprise the context of [child sexual] abuse and children's responses" to that abuse, going on to describe five possible characteristics or behaviors associated with child victims of sexual abuse: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation. And later on direct examination Dr. Urquiza was asked this:

"Q. The last factor, the fifth factor: retraction?

"A. Yes.

"Q. I know we kind of touched on that when I was going over myths and misconceptions. Tell me about how that plays a factor in sexual abuse accommodation syndrome.

"A. Well, understanding that, one, we are talking about kids who have been abused, and understanding that it's a really difficult thing to be able to make a disclosure of abuse, that's a hard thing to do to begin with, but if you make a disclosure and there is no support for you as a child, if your mom or dad or somebody tells you, 'No. Don't say that. Take that back,' then those are the kinds of things that undermine that child's ability to make—to sustain that disclosure. [¶] And so the best research that we have at the moment is that roughly, what I said earlier, 20 to 25 percent of kids who have been abused and are able to make a disclosure take back that allegation of abuse, usually because of some type of family pressure imposed upon them."

Direct examination of Dr. Urquiza ended on, 28 pages in all, and defense counsel Carrington began her cross-examination. Following some preliminary questions, she leadingly asked, your "information doesn't necessarily apply to this case at all," to which Dr. Urquiza replied, "I'm not here to testify about any aspect, specific aspect of this case." Ms. Carrington then spent several pages inquiring into Dr. Urquiza's background, his current practice, his publications and his teaching. She then turned to the "five elements" he had mentioned, beginning with "secrecy," where this exchange took place:

"Q. Okay. All right. So you're saying that it should not—it's inappropriate for the child sexual accommodation syndrome to be used as a tool to determine whether or not a child has been sexually abused?

"A. Yes. And I believe he would agree with me.

"THE COURT: Let the record reflect the Judge nodding his head vigorously up and down."

The cross-examination then turned to "delay in disclosure," where Ms. Carrington spent several pages confronting Dr. Urquiza with various journals and particularly the work of one Dr. Summit, which examination ended with this exchange:

"Q. Okay. So what scientific data did he present to show that adults had these common myths?

"A. I don't believe he did in his 1983 article.

"Q. Okay. Now, you mentioned the recantation. You said there is approximately 20 to 25 percent of children who have actually been abused that recant?

"A. Correct.

"Q. And so there are 75 to 80 percent of children that recant who were actually not abused?

"A. No. There are other kids who have been abused that didn't recant.

"Q. Okay. All right. So how do you—how do you quantify the kids—or can you quantify the kids that recant and actually weren't abused?

"A. You mean—are you going to the land of false allegations?

"Q. Yes.

"A. Whenever anybody asks me about false allegations in sexual abuse, I have a caveat that I usually start with which is: it's hard to do research on kids. It's hard to do research on sexual abuse with kids—with sexual abuse on kids. And I think it's even harder to do research on false allegations of sexual abuse.

"Now, there is a body of research. It's not huge, but there is a body of research on false allegations. I am glad to talk with you about it. But

27

basically it does happen.  It does not happen very frequently.  I usually use the term it happens very infrequently or rarely.  But it does happen that sometimes kids who have not been abused will say that they were sexually abused."

Two pages later the examination ended.

In support of his first argument that trial counsel Carrington was ineffective for not objecting to Dr. Urquiza's testimony, Thompkins provided a declaration from her, where she testified in part as follows:

"My defense theory of the case was that the alleged victims in this case, T.C. and A.G., had not been purposely dishonest, but that they had been unduly influenced.  There was a high level of suggestibility from the MDIC interviewer (Vicky Rister, the investigator from the District Attorney's Office) and CWS (Wendy Smith, the CWS social worker).  The two girls were essentially saying what they thought the interviewers and the social worker wanted them to say.  In support of that line of defense, I called Dr. William O'Donahue who described how children can form 'false memories' of abuse based on suggestive questioning during an interview.

". . . The two girls here had either recanted their prior out-of-court allegations of molestation or had refused to confirm or repeat those claims in court.  Consequently, Dr. Urquiza's testimony that a high proportion of actual child sexual abuse victims (20 to 25%) recant truthful allegations of abuse was definitely not helpful to the defense.  Similarly, his assertion that scientific research has established that false allegations of such abuse occur 'very infrequently or rarely' was damaging to the defense.

". . . I did not have any tactical reasons for allowing those portions of Dr. Urquiza's testimony to go before the jury.  I would have preferred to have that testimony excluded or stricken.  I had reviewed Dr. Urquiza's testimony

in two prior trials in which he had made similar assertions regarding the rarity or very low percentage of false allegations of abuse. However, at the time of the *Thompkins* trial, I was not aware of any legal basis for seeking exclusion of that testimony. If I had been aware of such grounds, I would have objected or have asked the court to strike those portions of Dr. Urquiza's testimony.

". . . I first became aware of the legal basis for excluding such expert testimony in July or August 2019, when I received a service copy of the Second Petition for Rehearing in Mr. Thompkins's appeal, A152363."

The Director responds that Thompkins has submitted no expert "criminal defense" testimony as to what trial counsel should have done. Thompkins replies with this: "We have presented something better tha[n] the opinion of 'a criminal defense expert.' *Published judicial opinions*, including one from this Court, have expressly held that there could not have been a reasonable ground for foregoing objection to expert testimony on the putative rarity of false molestation allegations or to similar probabilistic testimony beyond the proper bounds of CSAAS. 'There is no justification for counsel's failure to object to Urquiza's statistical evidence on false allegations.' ([*People v.*] *Julian* [(2019)] 34 Cal.App.5th [878,] 888 [(*Julian*)]; see Pet. 45 for further discussion.)"

The "published judicial opinions" are *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*); *Julian, supra*, 34 Cal.App.5th 878; *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*); and *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*), the last case being the "one from this Court." We discuss them in order.

On March 27, 2019, our colleagues in Division Four filed *Wilson*, a prosecution for 12 counts of lewd conduct against the daughter of Wilson's

29

live-in girlfriend, in which Dr. Urquiza testified as to the infrequency of false allegations of child sexual abuse. Surveying numerous cases nationally, both state and federal, our colleagues held that such testimony invaded the province of the jury, saying this: "Dr. Urquiza's testimony had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although Dr. Urquiza's testimony on this point was not expressly directed to either L.D. or J.D., the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In doing so, this testimony invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' [Citations.]" (*Wilson*, *supra*, 33 Cal.App.5th at pp. 570–571.) Our colleagues went on to find the admission of the evidence not prejudicial, as defendant there—as did Thompkins here—had called his own expert in rebuttal. (*Wilson*, at p. 572.)

*Julian*, an opinion by Division Six of the Second Appellate District filed a month after *Wilson*, involved a prosecution for four counts of lewd acts upon a child and one count of sexual penetration with a child under 10. Dr. Urquiza testified about CSAAS theory. (*Julian*, *supra*, 34 Cal.App.5th at pp. 882–883.) The Court of Appeal described what happened next:

"After presenting CSAAS evidence, the People introduced a new issue— the statistical percentage of false allegations by child sexual abuse victims. Urquiza testified false allegations by children 'don't happen very often.' '*The range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe, six, seven, eight percent of cases that appear to be false allegations.*' (Italics added.) Julian's trial counsel did not object to this testimony. [¶] Urquiza testified one study showed that of the [four] percent of cases where

30

there are false allegations, the 'largest subgroup' involved 'some type [of] custodial dispute.' He also said that research bears out that false allegations are '*very infrequent, or rare.*' (Italics added.)" (*Julian, supra,* 34 Cal.App.5th at p. 883.)

Citing many of the same authorities as in *Wilson,* the Court of Appeal held that "[t]his statistical probability evidence deprived Julian of his right to a fair trial." (*Julian, supra,* 34 Cal.App.5th at p. 886.) In particular, citing to *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, the Court said: "At trial [in *Snowden*] an expert witness testified that 'child witnesses in sexual abuse cases tell the truth' 99.5 percent of the time. [Citation.] The court said, 'That such evidence is improper, in both state and federal trials, can hardly be disputed.' [Citation.] 'The jury's opinion on truthfulness of the children's stories went to the heart of the case.' [Citation.] 'Witness credibility is the sole province of the jury.' [Citation.] Allowing this expert testimony to 'boost the credibility of the main witness against [the defendant]' resulted in a 'fundamentally unfair' trial. [Citation.]" (*Julian,* at p. 886.)

The Court of Appeal went on to hold that by failing to object to such testimony, trial counsel provided ineffective assistance, as there was no justification for the failure to object. And, the court concluded, the errors were prejudicial under any standard, and reversed and remanded for a new trial given the circumstances there—circumstances the Court of Appeal described in detail:

"Urquiza used that opportunity to repeatedly reassert his claim that statistics show children do not lie about being abused. [Julian's] counsel's questions about multiple studies only opened the door to a mountain of prejudicial statistical data that fortified the prosecutor's claim about a

31

statistical certainty that defendants are guilty. (*In re Jones* (1996) 13 Cal.4th 552, 571.)

"Moreover, in closing argument, the prosecutor asked the jury to rely on Urquiza's statistical evidence that 'children rarely falsify allegations of sexual abuse.' He reminded jurors that Urquiza 'quoted a Canadian study for over 700 cases, *not a single one where there was a false allegation.*' (Italics added.) The claim that there is a zero percent chance children will fabricate abuse claims replaced the presumption of innocence with a presumption of guilt.

"In his closing argument, Julian's counsel discussed his position regarding Urquiza's testimony about the '12 studies,' the Canadian study, the Trocme & Bala study, a social worker study showing 'four percent or five percent' as false allegations, and the prosecutor's claim that 'false allegations are very rare.' When he discussed the statistical percentage of false allegations in a study called 'false allegations of sexual abuse of children and adolescents,' the prosecutor objected. The court stopped the argument for a 15-minute recess. When the jury returned, the court instructed jurors that there was 'a disagreement' by counsel about 'a certain study.' The jury should decide the issue based on the evidence introduced about the study, not what the lawyers remember about it. Consequently, the jurors' attention was directed, once again, to the statistical study evidence right before they began their deliberations." (*Julian, supra*, 34 Cal.App.5th at pp. 888–889.)

On July 29, 2021, the Fourth Appellate District filed *Lapenias, supra*, 67 Cal.App.5th at page 177, where defendant was convicted of six offenses against his stepdaughter. There, while CSAAS expert Dr. Blake Carmichael was testifying, a juror asked, "is it common for children to make up a story that abuse occurred, when, in fact, it did not?" Lapenias's counsel objected to

the question, but the court allowed it, and the expert testified "no, that's rare." (*Ibid.*) As relevant here, the Court of Appeal held that: (1) the trial court properly admitted CSAAS evidence, and (2) although the court erred by allowing the Dr. Carmichael to testify that it is "rare" for children to make up stories about sexual abuse, the error was not prejudicial, as the testimony was brief, and the victim's contemporaneous disclosures to a close friend about being molested by defendant provided corroborative evidence of his guilt. (*Id.* at pp. 179–181.)

Our recent opinion in *Clotfelter* involved a prosecution for violating section 647.6, and we held there was no substantial evidence that Clotfelter engaged in conduct objectively irritating or disturbing under that section. (See *Clotfelter*, *supra*, 65 Cal.App.5th at pp. 52–53.) As to the CSAAS testimony involved there, it had nothing to do with recantation. (*Id.* at p. 64.) Moreover, we held—as the Attorney General conceded—that the expert misused the CSAAS testimony to suggest that the victims had actually been abused. (See *ibid.*) Indeed, *Clotfelter* involved so many instances of improper trial conduct that we took the unusual step of reminding trial judges presiding over criminal cases of their independent responsibility in the conduct of such trials. (See *id.* at p. 69, fn. 11.)

That, then, is the setting in which we review Thompkins's claim of ineffective assistance of trial counsel. And conclude it has no merit—for several reasons.

First, it must be recalled that the trial here was in April 2017, two years before the first of the cases Thompkins cites in claimed support of the law that supposedly supports him. So, even assuming that the cases support his position, such law cannot be relied on to support a claim of ineffective assistance two years earlier. As noted, counsel is not incompetent for failing

to anticipate a change in law: "the constitutional standard for effective assistance of counsel has never required . . . prescience." (*People v. Dennis*, *supra*, 17 Cal.4th at p. 537; *People v. Turner*, *supra*, 50 Cal.3d at p. 703.)

Indeed, if one would look for the law as of 2017, when the trial took place, one would find *People v. Housley* (1992) 6 Cal.App.4th 947, 954–956 (*Housley*), a decision by this court, which held that testimony of recantation is admissible to "dispel certain common misconceptions regarding the behavior of abuse victims." There, the victim recanted her previously-asserted claim that her grandfather had sexually molested her when she was a child. (*Id.* at p. 951.) A prosecution expert testified that "it is very common for victims of abuse to recant the story after first making a report because they may not be believed, or may be removed from their home, or may fear the offender will suffer negative consequences from the reported abuse." (*Id.* at p. 952.) As we described it, appellant argued it was "error to allow the doctor to testify that victims commonly and falsely recant their stories of abuse." (*Id.* at p. 954.)

We rejected defendant's challenge to the introduction of such testimony, holding that it neither constituted an improper opinion as to the victim's credibility nor improperly suggested that the molestations had actually taken place, as the expert had made clear—just as here—that she had never met the victim, was unfamiliar with the details of the case, and had never read any reports associated with the matter. (*Housley*, *supra*, 6 Cal.App.4th at pp. 954–955.) And we concluded, "[i]t is . . . unlikely the jury would interpret [the expert's] statements as a testimonial to [the victim's] credibility." (*Id.* at pp. 955–956.)[5]

---

[5] Our Supreme Court has since cited *Housley* with approval in finding similar testimony appropriate in the context of domestic violence. (*People v. Brown* (2004) 33 Cal.4th 892, 906–908.) There, the victim recanted her previously-asserted claim that her boyfriend had assaulted her. (*Id.* at

A similar case is *People v. Bowker*, *supra*, 203 Cal.App.3d at page 394, where the Court of Appeal held that "Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings."

Second, the cases on which Thompkins relies did not involve the testimony about which he fundamentally complains here—recantation.

And third, even if there were error—which Thompkins has not demonstrated—his claim would fail for lack of his ability to prove prejudice, just as in *Wilson* and *Lapenias*.  Only *Julian* held the error was prejudicial, and Thompkins points to *Julian* which he describes as "squarely on point." Hardly.  The circumstances here are a far cry.

The extensive focus on Dr. Urquiza's testimony in *Julian*, in both the case in chief and the closing arguments, was described by the Court of Appeal in detail, as noted above.  There is no comparable focus here.  The sum of Dr. Urquiza's challenged testimony here comprises a tiny part of his 51 pages of testimony, explains that it is very hard to conduct research of child sexual abuse and even more difficult to conduct research on false allegations, and provides that the body of research is "not huge" on this topic but suggests

pp. 896–897.)  A prosecution expert testified that "[a]bout 80 to 85 percent of victims [of domestic violence] 'actually recant at some point in the process,' " with some saying, "they lied to the police" while "almost all will attempt to minimize their experience."  (*Id*. at p. 897.)  The Supreme Court concluded there was an adequate foundation for the expert testimony and such testimony was admissible to dispel the misconception that, "when the victim's trial testimony supports the defendant or minimizes the violence of his actions, . . . if there really had been abusive behavior, the victim would not be testifying in the defendant's favor."  (*Id*. at pp. 906–907.)

that false allegations do occur, albeit rarely or very infrequently.  Dr. Urquiza did not further expound on the topic, provide statistical data, or discuss specific studies or their findings, as he did in *Julian* or *Wilson*. In short, Thompkins has not demonstrated that the outcome of the trial would have been more favorable had counsel objected to Dr. Urquiza's brief testimony. There are several reasons why.

First, Dr. Urquiza's testimony included a warning that it was difficult to conduct research with children alleging sexual abuse, and even more difficult to conduct research on false allegations of child sexual abuse, thereby limiting the impact of his testimony.  Second, he explained that the "research" was "not huge," further minimizing the impact of that testimony to the jury.  Third, the challenged testimony was brief.  Fourth, Dr. Urquiza made it clear he knew nothing about the specific case or allegations and could not render an opinion as to guilt or innocence of a crime or whether a particular child has been abused.  And fifth, Dr. Urquiza repeatedly emphasized his testimony was purely educational:  "[T]he purpose is to educate a jury so that they have good information about sexual abuse sort of as a foundation so that when they hear the evidence in this case, they may not be subject to any misperception or myths that they may have previously held and would be able to render a better decision about guilt or innocence." Thus, the challenged testimony was simply not likely to prejudice defendant in light of the overall evidentiary presentation.

Moreover, and unlike the prosecutor in *Julian*, in closing argument the prosecutor did not focus on Dr. Urquiza's testimony, focusing on A.G. and T.C.'s videotaped interviews, dispelling any suggestion that the children's statements were the product of suggestibility rather than actual abuse.  He also discussed the charge regarding J.G. and the percipient witness's

36

testimony as to that incident.  Indeed, the prosecutor referred to Dr. Urquiza only three times during his opening argument.  First, in discussing one of the girls' videotaped interviews, the prosecutor reminded the jury that "you have to put in this context of a child reporting an incident of sexual abuse.  Dr. Urquiza . . . tried to help walk you through this, about why a child might have difficulty remembering details, might have a delayed report, might have discomfort talking about it."  Second, after referencing how T.C. could "barely get through the door" to testify and ultimately denied the abuse, the prosecutor explained, "Dr. Urquiza explained that that happens.  Of course that happens.  This is not something that kids want to talk about."  And, finally, after discussing J.G.'s abnormal behavior while in foster care, the prosecution explained it with reference to Dr. Urquiza.[6]  The prosecutor spent

---

[6] "Dr. Urquiza was the expert that we had testify about child sexual abuse accommodation syndrome and to help get rid of some of the myths associated with child sexual abuse.  Dr. Urquiza, as we covered many, many times, was not here to prove that sexual abuse occurred.  His role is to try to bring jurors back to neutral.

"He is trying to bring you back to zero so that you can objectively evaluate the evidence.  That was his role.  Because jurors often come in with these myths that just aren't true about, 'Well, kids are abused, and they run and report it right away.'  Well, that's not true.  Science says that that is not how it works.

"Or that children will have these photographic memories about what happened.  That's not true, either.  False reports are not common.  And, in fact, a child recanting, a child saying, 'No, it didn't happen,' after the investigation starts and they've got to talk to police, people are questioning them, of course they are going to think, 'Oh my god.  Did I set off something?  Am I in trouble?  Am I responsible?'

"And, again, the easy way, like [T.C.] is saying, 'If I just say no, I don't get questioned.  I don't have to do this anymore.'  And Dr. Urquiza, he makes his living off of studying this.  And contrary to Dr. O'Donahue, Dr. Urquiza didn't know a thing about this case."

37

the remainder of his argument discussing defense expert testimony, admonishing the jury not to speculate on things not in evidence, explaining the date range for the charges, and reviewing the burden of proof. And he concluded, "Tie every decision to the evidence, and you will be able to reach a reasonable conclusion in this case."

Defense counsel Carrington argued that the percipient witnesses were inconsistent, provided uncorroborated testimony, and that A.G.'s and T.C.'s accusations against Thompkins were the product of suggestive interviews. Defense counsel referred to Dr. Urquiza only briefly, reminding the jurors that Dr. Urquiza said it would be "inappropriate" for the jury to use CSAAS to determine whether or not a child has been molested, arguing that, "And you are here to determine that. So that gets you nowhere. That neither adds nor takes away from your ability to decide this case."

The prosecutor referred to Dr. Urquiza only once during rebuttal, however passingly, where, referring to defense counsel's theory, said this: "Everybody is lying. Kenneth Boyd is lying. Tara Gulley is lying. Wendy Smith is lying. Dr. Urquiza isn't truthful with you about what the real science is about."

Prejudice was further avoided by the testimony of defense expert O'Donahue, who testified that "25 percent of adults can . . . be suggested, can form false memories," and research showed "similar sorts of effects [with children] but much higher rates." He further testified that young children of three to five years old can form "false memor[ies]" based on the type of questioning performed during an interview, explaining that there are "18 criteria that a good interview ought to have," and a problem may arise if one of the criteria is absent. In this way, Dr. O'Donahue's testimony reinforced the notion that false memories—and thus false allegations—occur.

38

Also bearing on the lack of prejudice is that the trial court instructed that Dr. Urquiza's testimony could not be used as evidence that Thompkins committed any of the crimes charged, that the jury alone must judge the credibility or believability of the witnesses. It is presumed that the jurors followed these instructions. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 202.)

Finally, there are the videotaped interviews of A.G. and T.C., where the two girls chronicled their abuse with detailed—and compelling—evidence that provided the jury with ample opportunity to judge the credibility of both girls based on a variety of factors including demeanor, body language, tone of voice, word choice, descriptions of the abuse, and their various interactions with the interviewer. And after relatively brief deliberations, the jury reached its verdict, in which it convicted on two counts and acquitted on one other, a verdict that shows the jury thoughtfully and properly relied on the case and the truthfulness of the allegations—not the expert witness.

### Appellate Counsel was not Ineffective in Briefing the Prosecutorial Vindictiveness Claim

Thompkins's second claim of ineffective assistance of counsel is that appellate counsel Childs was ineffective for the way he briefed the issue of vindictive prosecution to us. The petition acknowledges that the claim "does not involve a complete failure to raise a vindictive prosecution claim but deficiencies in *how* appellate counsel presented that claim—specifically, his failure to address the independent protections of the California Constitution and the role of prior attachment of jeopardy in analysis of that claim." And the traverse acknowledges that any success on the claim "depends almost entirely on the probable merits of the underlying claim." We find no merit.

To begin with, Thompkins has not demonstrated that Mr. Childs's briefing on vindictive prosecution, following our request for further briefing, was unreasonable. That briefing relied on the controlling state cases of

*Twiggs*, *supra*, 34 Cal.3d 360 and *Bower*, *supra*, 38 Cal.3d 865 and argued: "Here, the defendant exercised his right to a trial—twice. The first trial was aborted, after the attachment of jeopardy, because the prosecution failed to timely comply with its discovery obligations. The second trial resulted in a mistrial as well, since (per defense counsel's report) the jury hung 10–2 for acquittal. Only after the result of that trial did not please the prosecutor were new charges added, based on evidence the prosecutor had long possessed. There can be no explanation for the prosecutor's decision to add new charges other than a vindictive motive, which must therefore be presumed."

Our opinion addressed the issue in a lengthy and detailed analysis rejecting the claim. Doing so, we set forth the facts pertinent to the issue, many of which are recited above. We then provided our "legal analysis" (*Thompkins*, *supra*, A152363 at p. 14), including the standard of review (*id.* at p. 13), and the relevant law (*id.* at p. 14), and from there went on to discuss at length both *Bower* and *Twiggs*. (*Thompkins*, at p. 15.) Then, following exposition of "the contentions of the parties" (*id.* at p. 19), we referred to, and quoted from, the prosecutor's declaration which "stressed the decision making that took place during the plea bargaining carried out in chambers on March 7, 2016." (*Id.* at p. 20.) After more discussion as to what occurred, we concluded that "[Thompkins], who was at all times represented by competent counsel who vigorously protected his interests, must be deemed to have been fully informed of the consequences of rejecting the plea bargain offered by the prosecutor on March 7, 2016." (*Id.* at p. 12.) And we went on to hold, "Nothing in the record indicates it would be unreasonable for us to assume, as we do, that, after weighing the

40

competing considerations with the assistance of able counsel, appellant rejected the plea bargain offered by the prosecutor with full knowledge of the risk that eventually materialized: the imposition of a life sentence. (See *Bordenkircher* [*v. Hayes* (1978)] 434 U.S. [357,] 360.)" (*Thompkins*, at p. 22.)[7]

Our opinion recognized that "The exception [to claims of prosecutorial vindictiveness] recognized in the federal case law for plea bargaining is also recognized in California." (*In re Bower, supra,* 38 Cal.3d at p. 876.) We also recognized that "[t]here is no vindictiveness where . . . the prosecutor's intention to increase the severity of the charges ' "was clearly expressed at the outset of the plea negotiations" ' and the defendant ' "was thus fully informed of the true terms of the offer when he made his decision to plead not guilty." ' " (*Thompkins,* supra, A152363, at p. 23, quoting *Twiggs, supra,* 34 Cal.3d at p. 370; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 98 ["It is not a constitutional violation . . . for a prosecutor . . . to threaten to increase the charges if the defendant does not plead guilty"].)

The opinion noted that during pretrial discussions, the prosecutor "urged counsel to resolve the case as charged because there were potential additional charges and multiple ways to achieve a life sentence against defendant given his priors and the two other victims." (*Thompkins, supra,* A152363, at p. 20.) And that the trial court corroborated and credited this assertion. (*Id.* at pp. 20–21.) Accordingly, given the parties' pretrial discussions, we concluded that neither the prosecutor's amendment to add the three-strikes enhancement nor its filing of the second case against

---

[7] We also noted, "Moreover, with respect to appellant's claim that the prosecution did not allege the prior convictions as strikes until the retrial, the record belies that assertion," going on to demonstrate why. (*Thompkins, supra,* A152363, at pp. 22–25.)

defendant gave rise to a presumption of vindictiveness. (*Thompkins*, at p. 24.)

Further, we held that *Twiggs* contradicted Thompkins's assertion that the plea-bargaining exception to claims of prosecutorial vindictiveness does not apply where the prosecution seeks to increase charges following either a mistrial or the swearing of a jury. While *Twiggs* found that a presumption of vindictiveness arose where the prosecution sought to increase the charges following a mistrial (*Twiggs*, *supra*, 34 Cal.3d at pp. 364, 372), it specifically noted that "*Bordenkircher*[, *supra*, 434 U.S. 357] specifically did not decide the issue of vindictiveness presented in a case such as this, where the record suggests that the more serious charges were not part of the 'give-and-take' of plea negotiations. Rather, in this case, the circumstances strongly suggest that the prosecutor unilaterally imposed a penalty in response to the defendant's insistence on facing a jury retrial." (*Twiggs*, at p. 371.) And in line with *Twiggs*, we rejected the argument that the timing of the prosecution's actions makes the plea-bargaining exception inapplicable: "The fact that in this case the additional charges were added after a mistrial and before the subsequent retrial does not change the result, given that the prosecut[or] had informed [defendant] of the possibility of such charges during plea negotiations that took place well before the prior trial ended in a mistrial. Thus, in this case, unlike *Twiggs*, the prosecutor did not 'unilaterally impose[] a penalty *in response* to the defendant's insistence on facing a jury retrial' (*Twiggs*, at p. 371, italics added), because at the time of the offer [defendant] was not facing a retrial." (*Thompkins*, *supra*, A152363, at pp. 23–24.)

Finally, we added that even if the presumption of vindictiveness applied, the prosecutor rebutted the presumption, concluding that: "the

possibility [that the two additional victims] would provide new evidence justifying additional charges was 'an objective change in circumstances' that 'legitimately influenced the charging process' (*Bowker*, *supra*, 38 Cal.3d at p. 879), but the initial uncertainty whether those two children would testify against [defendant] justified the delay in deciding whether to charge the offenses involving them until after the mistrial due to the hung jury." (*Thompkins*, *supra*, A152363, at p. 21, fn. 8.) Given the established uncertainty about whether the new evidence would arise, the prosecutor sufficiently rebutted the presumption of vindictiveness.

Those were the facts, and the factors, relied on by us in our opinion, a factual narration, we hasten to add, never challenged by Thompkins, not in his petition for rehearing following our opinion—and perhaps most significantly of all, not in the 2021 declaration by trial counsel Carrington.

Were all that not enough, it must be recalled that after appellate counsel Childs withdrew from the case, FDAP itself filed a petition for rehearing arguing that a presumption of prosecutorial vindictiveness is required under state constitutional grounds and because jeopardy had attached—an argument similar, if not identical, to FDAP's current argument (although shorter). Indeed, Thompkins's own petition describes FDAP's petition for rehearing as raising a "request for reconsideration of this Court's rejection of the vindictive prosecution claim in view of the independent state constitutional basis for the California Supreme Court's leading cases and of the crucial role of the prior attachment of jeopardy under those authorities." We rejected the argument and denied rehearing. Rearguing it here is no more successful.

## DISPOSITION

The petition for habeas corpus is denied.

_____

Richman, Acting P. J.


We concur:



_____

Stewart, J.



_____

Miller, J.









*In re Thompkins on HC* (A160500)


44